## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN

DAWN PETRIE,

        Plaintiff,

      v.                                Case No. 19-C-1692

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

Plaintiff Dawn Petrie filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Petrie contends that the administrative law judge's (ALJ) decision requires remand for several reasons: (1) the ALJ's evaluation of the severity of Petrie's spinal headaches rests on an incomplete assessment of the medical record and relevant factors under SSR 16-3p; (2) the ALJ erred in evaluating Petrie's allegations of vertigo and evidence related to that impairment; (3) the ALJ did not provide good reasons to reject the lifting limitation recommended by a rheumatologist and did not otherwise consider how Petrie's joint condition affected her lifting ability; (4) the residual functional capacity (RFC) does not account for Petrie's moderate limitations in concentration, persistence, or pace (CPP); and (5) the ALJ improperly rejected the results of a functional capacity evaluation (FCE) that supported a finding of a sedentary RFC. For the reasons that follow, the decision of the Commissioner will be affirmed.

# BACKGROUND

On January 5, 2017, Petrie filed applications for a period of disability and disability insurance benefits, as well as for supplemental security income, alleging disability beginning on March 14, 2015. R. 14. She listed vertigo, "Meniers," and Marfan syndrome as conditions limiting her ability to work. R. 359. After her claims were denied initially and upon reconsideration, she requested a hearing before an ALJ. R. 14. At a hearing on September 18, 2018, Petrie, who was represented by counsel, and a vocational expert (VE) testified. R. 45–77.

At the time of the hearing, Petrie was 51 years old and living alone. R. 49, 57. She had completed some college and had earned certificates for massage therapy and aesthetics. R. 50. Petrie was last employed in September 2016 when she worked part time as a receptionist at a spa and part time as a retail cashier. *Id*. Between both jobs, she worked about 20 hours per week. R. 51. Prior to those positions, she worked as a server at her brother's café, at Massage Envy doing massage therapy and facials, as a hostess at a restaurant, as a cashier for several other shops, and as an aesthetician at Shearer Plastic Surgery. R. 52–54. She stopped working because she had "very bad vertigo" and was later diagnosed with Ménière's disease. R. 51. When asked what kept her from working, Petrie testified that fluorescent lights, computers, and strong scents trigger migraines, concentrating gives her bad headaches, she is unable to stand for ten minutes or more, has to change positions every twenty minutes, and has to drop to the floor when she gets supraventricular tachycardia. R. 54. Petrie also added that she cannot write much, grasp, or unscrew caps; has chronic pain and fibromyalgia; fatigues easily; gets vertigo; has post-traumatic stress disorder (PTSD); and has a lot of pain. R. 55.

The ALJ then asked Petrie how far she was able to walk, to which she responded that, when she has a Ménière's attack, she cannot move and, when she has "the other kind of vertigo," she

2

cannot walk either depending on her symptoms on a given day.  *Id*.  Petrie stated that with her intercranial hypertension she cannot walk far because her head hurts badly and that, when she sits, she has to shift positions frequently.  R. 55–56.  Petrie testified that she is taking over-the-counter medications and avoids prescriptions because of side effects, such as headaches and dizziness as well as issues with her gastritis.  R. 56.  She later noted that she takes Meclizine and Zofran, but that they are "so part of [her] life" that she does not view them as prescriptions anymore.  R. 59.

Petrie testified that on a typical day, she usually feels "crappy," and tends to stay home and take it easy in the mornings, then she tries to go church, and then returns home and sometimes latch hooks or listens to books on tape at a slowed speed.  R. 56–57.  Petrie described having Ménière's attacks, where "everything is spinning," about four non-consecutive months each year, with attacks longer than five minutes averaging out to about once a week over the course of a year. R. 58, 60.  She stated that she takes Meclizine for the attacks, which knocks her out and makes her tired, and it takes her well into the next day to "bounce back."  R. 61.  She testified that she also has different kinds of vertigo several times per day.  R. 62.

In a 24-page decision dated December 4, 2018, the ALJ concluded that Petrie was not disabled.  R. 14–27.  The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA).  At step one, the ALJ found that Petrie had not engaged in substantial gainful activity since March 14, 2015, the alleged onset date, and that Petrie met the insured status requirements of the Social Security Act through December 31, 2020.  R. 16.  At step two, the ALJ found that Petrie had the following severe impairments: connective tissue disorder; headaches; vertigo; degenerative disc disease of the cervical, thoracic, and lumbar spines; and anxiety and PTSD.  R. 17.  At step three, the ALJ concluded that Petrie did

not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

The ALJ then assessed Petrie's RFC. R. 20–21. The ALJ found that Petrie had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she

> (1) can occasionally climb stairs and ramps; (2) can never climb ladders and scaffolds; (3) can occasionally balance, stoop, kneel, crouch, and crawl; (4) occasionally reach overhead with bilateral upper extremities; (5) must avoid concentrated exposure to extreme cold, extreme heat, humidity, and wetness; (6) must avoid concentrated exposure to industrial types of vibrations; (7) must avoid concentrated exposure to hazards such as moving mechanical parts and unprotected heights; and (8) must avoid moderate exposure to very loud work environments. Further, [Petrie] (1) can understand, remember, and carry out simple instructions; (2) can only make simple, work-related decisions; (3) an only tolerate occasional change in work location; and (4) cannot work at a strict production rate such as that required to work on an assembly line.

*Id.* At step four, the ALJ determined that Petrie was unable to perform any past relevant work. R. 35. At step five, the ALJ noted that Petrie's ability to perform all or substantially all of the requirements of the range of light work had been impeded by additional limitations, and thus the VE was asked to testify as to what jobs Petrie could perform given those additional limiting factors. R. 36. The VE testified that given all of the factors identified by the ALJ, Petrie could perform representative occupations such as marker, routing clerk, and photocopy machine operator, which together represented about 90,000 jobs in the national economy. *Id.* Based on that testimony, the ALJ determined that Petrie was capable of making successful adjustments to other work existing in the national economy. *Id.* Considering Petrie's age, education, work experience, and RFC, the ALJ found there were jobs existing in significant numbers in the national economy that she would be able to perform and she was therefore not disabled under the Social Security Act. *Id.* The Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of the decisions of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof; a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence refuting the claimant's assertion that she cannot hold a full-time job. In most cases that go to hearing, such

5

evidence is not available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir.

2019).  Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  Finally, judicial review is limited to the rationales offered by the ALJ.  *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Evaluation of Medical Opinion Evidence

Petrie asserts that the ALJ erred in evaluating the statements of her treating rheumatologist, Kent Partain, M.D., relating to Petrie's hypermobility and the functional capacity findings of Occupational Therapist Lize Slabbert.  Although Petrie characterizes her criticism of the ALJ's analysis as a claim of legal error, a close reading of the ALJ's decision and Petrie's critique suggests that her dispute is really over the weight and significance the ALJ gave to certain evidence, matters that lie well within the province of the Commissioner.  As for the applicable rules and regulations governing the determination, the ALJ explicitly acknowledged and applied them.  R. 31–34.

As the ALJ acknowledged, generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence."  *Burmester*, 920 F.3d at 512; 20 C.F.R. § 416.927(c)(2); SSR 96-2p.  If the ALJ decides to give lesser weight to a treating physician's

7

opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

### 1. Dr. Partain's 15-Pound Lifting Restriction

In October 2017, Petrie presented to a rheumatology evaluation with Dr. Partain. R. 1434–38. Petrie reported ongoing issues with pain and feelings of subluxation about the shoulders and the kneecaps. She expressed concern about her upcoming functional capacity evaluation and the need to lift much more than 15 pounds. R. 1437. Upon examination, Dr. Partain observed that Petrie still had "just a bit of crepitus about the shoulders. She hyper abducts to around 100° and rotates just a bit beyond 90°. She does have a half hyperextension of the elbows . . . ." R. 1437. Dr. Partain noted that Petrie appeared to have some difficulties with hypermobility in numerous places. He elected to send her to physical therapy to concentrate on the hypermobility about the shoulders and knees, to ask that she undergo evaluation of her thumb joints, and to evaluate her for impaired proprioception. He stated, "I will suggest a weight restriction of 15 pounds." R. 1438. In the patient instruction section of his treatment notes, Dr. Partain provided, "I would recommend that due to your Marfan syndrome and the hyper mobility you have with it, that you restrict your lifting to no more than 15 pounds." *Id.*

The ALJ provided the following explanation for giving Dr. Partain's restriction some, but not great, weight:

> First, this opinion is provided by a treating rheumatologist that has had an opportunity to examine and observe the claimant. Second, the statement provides a rationale that the recommendation is based on the claimant's hypermobility. This rationale, although brief, supports the recommendation. Third, the recommendation is supported by the physical examinations, which show evidence of hyper mobility (see Exhibit 4F, pp. 6-7; Exhibit 5F, p. 11; Exhibit 15F, p. 7; Exhibit 24F, pp. 3-4; Exhibit 28F, p. 49; Exhibit 35F, p. 2). It should be noted that this is a suggested recommendation that the claimant not lift more than 15 pounds but does not specify that the claimant is incapable of lifting more than 15 pounds or state how long this recommendation should remain in place. The suggestion should not be assumed to be a permanent restriction regarding her work abilities absent some clear indication of such.

R. 32–33.

Petrie argues that the ALJ erred in finding that the opinion was a "suggested recommendation" that Petrie lift no more than 15 pounds. Even though the ALJ characterized the opinion as a "suggested recommendation," she considered the regulatory factors and assessed the weight to give the restriction. Petrie further asserts that the ALJ's rejection of the opinion based on the fact that Dr. Partain did not provide how long the recommendation should remain in place was improper. She maintains that, because she presented to Dr. Partain for joint dysfunction caused by a genetic, permanent condition, the ALJ could not reasonably construe Dr. Partain's opinion as possibly reflecting a temporary restriction. But Petrie does not cite to objective evidence or other evidence in the record supporting her assertion that the restriction was permanent. Moreover, it appears from the report that Dr. Partain's "recommendation" was made in response to Petrie's concern that she would need to lift much more than 15 pounds at the upcoming functional capacity evaluation. R. 1437–38. Other than the fact that she had some hypermobility in the joints, there is nothing in the report, other than her expressed concern, that explains why such a limitation makes sense. Furthermore, a 15-pound lifting limitation is

inconsistent with Dr. Byrd's opinion that Petrie was capable of a limited range of light work, an opinion the ALJ gave significant weight because it was generally consistent with the longitudinal record and physical examinations which, "while showing evidence of hypermobility of some joints, showed normal range of motion of the extremities, normal muscle strength, normal reflexes, normal coordination and normal gait." R. 31 (citing R. 477–78, 579–80, 593, 871, 1152, 1194–95, 1523).

In light of this evidence and because there is no evidence or clear indication that Dr. Partain's statement was a permanent restriction, the ALJ was not obligated to conclude that the restriction applied permanently. Petrie's disagreement with the ALJ's interpretation of Dr. Partain's opinion is not a basis for remand. Under the deferential standard of review, the Court finds the ALJ reasonably considered and addressed Petrie's hypermobility in her RFC assessment. The ALJ's assessment of Dr. Partain's 15-pound lifting restriction was not unreasonable.

### 2. Occupational Therapist Lize Slabbert's Functional Capacity Evaluation

Occupational Therapist Lize Slabbert completed a functional capacity evaluation (FCE) on November 2, 2017. During the evaluation, Petrie sat for 45 minutes. She lifted five pounds to her waist and above her shoulders. During walking and kneeling tests, Petrie complained that she felt like the floor was moving. R. 1361. Slabbert noted that Petrie demonstrated limited tolerance to sustained positions of bending, stooping, kneeling, and crouching, and that she was unable to assume these positions due to vertigo when changing the position of her head. R. 1358. She also indicated that Petrie's hand coordination was compromised as evidenced by poor grip strength and avoiding pinch grips due to pain in her thumbs. *Id.* During the assessment, Petrie requested two breaks of ten minutes to "quite [sic] her system down," and she rested in a dimly lit room where she lay with her upper body propped up. R. 1357. Slabbert concluded that Petrie retained the

ability to work at the sedentary level. R. 1351. She indicated that Petrie could never kneel, crouch, crawl, or do competitive squatting. R. 1354. Slabbert noted that Petrie demonstrated walking for 733 feet but concluded that Petrie could rarely walk. She concluded Petrie could occasionally stand, climb stairs, and complete bilateral fine motor tasks and could constantly sit. *Id.* She noted that Petrie's primary limiting factors are vertigo, which is aggravated by most movement, as well as pain in her neck and shoulders, right hip, and knee. *Id.*

The ALJ gave Slabbert's opinion that Petrie could sit constantly, stand occasionally, and rarely walk during the workday some weight. R. 33. The ALJ explained that, while the opinion is based on an objective functional capacity evaluation, its longitudinal probative value was limited because the opinion was based on a single evaluation and is only a snapshot of Petrie's functioning on the date of the evaluation. The ALJ also reasoned that, even though the opinion that Petrie could occasionally stand was based on Petrie's intermittent standing for five to ten minutes, it was not clear whether the limitation is for standing at one time or for an entire workday. In addition, the ALJ noted that the statement provides that Petrie could rarely walk but also notes that she walked 733 feet during the examination. It was unclear to the ALJ how that fact supported the limitation. Finally, the ALJ explained that, in regard to Petrie's lifting, carrying, pushing, and pulling limitations, the opinion ranged from the sedentary to the medium range of work, which would suggest that light work is within her demonstrated abilities. *Id.*

Petrie asserts that the ALJ failed to explain why a one-time evaluation would support giving the opinion less weight. She argues that, if the ALJ were to discount Slabbert's opinion based on a single evaluation, then the same should be done with the opinions of the state agency physicians who did not examine her. But the records reviewed by the state agency physicians provide a longitudinal view of a claimant's condition. Moreover, the ALJ explained that the FCE

11

was neither consistent internally nor with the longitudinal record. Conversely, the ALJ found that the state agency physicians' opinions were consistent with the record. *See* R. 31 ("Further, these assessments are generally consistent with the longitudinal record . . . . In short, I find these assessments are well supported, generally consistent with the evidence of record and entitled to significant weight."). Petrie's disagreement with the ALJ's assessment and weighing of this evidence does not warrant remand.

Petrie also argues that it was unreasonable for the ALJ to create confusion as to whether the standing limitation is for Petrie standing at one time or for an entire day. The FCE states, "Client's abilities are expressed as a portion of an 8-hour work day in accordance with U.S. Department of Labor terminology." R. 1352. Thus, Petrie argues, a limitation to occasional standing is a limitation to standing up to one-third of the workday. Pl.'s Br. at 25, Dkt. No. 16. She explains that a maximum duration of standing for five to ten minutes at a time is not inconsistent with a maximum ability to stand only up to one-third of the workday. Petrie also argues that the ALJ erred in questioning how Petrie's noted ability to walk 733 feet supported a limitation to walking only rarely. Even if the ALJ should not have questioned whether the occasional standing limitation is a limitation to standing up to one-third of the workday, it was not improper for the ALJ to give the opinion only some weight or find that the limitations were inconsistent with the record. The state agency physicians, Dr. Janis Byrd and Dr. Laura Rosch, found that Petrie had the ability to stand and walk for about six hours in an eight-hour workday. R. 87, 99. The ALJ gave significant weight to the state agency medical consultants and explained that their opinions are supported by a discussion and summary of the medical evidence and are generally consistent with the longitudinal record. R. 31. "Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do." *Young v. Barnhart*, 362 F.3d 995,

Case 1:19-cv-01692-WCG   Filed 03/24/21   Page 12 of 21   Document 25

1001 (7th Cir. 2004). The ALJ's analysis in this case was the "type of content consideration judges regularly make when assessing the weight to attribute to conflicting evidence." *Id.* The ALJ showed that she considered the regulatory factors in weighting the FCE, and it was within her discretion to assign it a lesser weight than other opinions that were based on a full review of the medical records. *See Larson*, 615 F.3d at 751; 20 C.F.R. § 404.1527(d)(2).

Petrie asserts that the ALJ erred in claiming that a range of FCE findings from sedentary to medium in the areas of lifting, carrying, pushing, and pulling suggested the ability to perform light work. Petrie argues that only lifting and carrying are the basic abilities necessary to function at each exertional level, and that the FCE concluded Petrie was limited to sedentary-level lifting and carrying. The Commissioner asserts that, even if "the Court does not agree with the ALJ's one statement, remand is not appropriate because the ALJ gave other reasons, supported by the medical record, for giving more weight to the opinions of Drs. Byrd and Rosch, than the opinion from Ms. Slabbert based on a one-time examination." Def.'s Br. at 27, Dkt. No. 23. The Court agrees. The ALJ gave logical reason for the weight she accorded Slabbert's opinion. Therefore, remand is not required on this basis.

**B. Evaluation of Petrie's spinal headaches and vertigo**

Petrie asserts that the ALJ erred in the evaluation of her allegations related to her spinal headaches and vertigo. The regulations set forth a two-step process for evaluating a claimant's statements about her symptoms. *See* 20 C.F.R. § 416.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, then the ALJ "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's

13

symptoms, the ALJ must consider whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record."  SSR 16-3p.  In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms.  *See id.* § 404.1529(c)(3).  A court's review of a credibility, or consistency, determination is "extremely deferential," *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013), and a court will reverse the ALJ's determination only if the plaintiff can show it was "patently wrong," *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Petrie argues that the ALJ did not consider all of her treatment records or the regulatory factors in evaluating her spinal headaches and vertigo.  But the fact that he did not discuss all of the records does not mean he did not consider them.  An ALJ is not required to discuss every piece of evidence in the record or provide a separate analysis for each factor.  *Similia v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).  In this case, the ALJ noted at the start of her discussion regarding Petrie's RFC that, although she considered all of the evidence in the "voluminous" record, she would not address every piece of evidence in the record in her decision.  R. 22.  Not only did the ALJ provide a detailed summary of the evidence in the record, she also analyzed the evidence and explained how it was inconsistent with Petrie's statements.

At the outset, the ALJ noted that Petrie alleged that she has Ménière's disease but that there were conflicting otorhinolaryngology (ENT) opinions as to whether she has Ménière's or vestibular migraines and weakness.  R. 23.  Because the evidence showed she had vertigo in any

14

case, the ALJ chose to use that term rather than a specific diagnosis of Ménière's. *Id*. The ALJ then discussed Petrie's record of psychotherapy sessions and a neuropsychological evaluation in March 2016, during which she reported "ongoing issues with tension headaches and migraines." *Id*. In October 2016, Petrie went to the emergency room, reporting pressure in her ears and vertigo that began "after her primary care provider gave her a decongestant for ear swelling." *Id*. The ALJ noted that Petrie's treatment of hydration, Meclizine, and ondansetron improved her symptoms, and she was discharged with a prescription for Meclizine and instructed to follow up with her doctor. *Id.*

The ALJ provided a detailed recitation of Petrie's various medical examinations and findings related to her vertigo in 2016 and 2017, including summaries of an ENT visit with Dr. Swanson in November 2016, during which she described periodic dizzy spells that happen "more when her allergies flare," and another ENT visit with Dr. Bettag in December 2016, where she reported intermittent vertigo episodes each lasting several hours, which "seemed to happen in the fall and get better." R. 25; *see also* R. 508, 599. Dr. Bettag opined that her symptoms were due to vestibular migraines, recommended that she try Imitrex, and referred her to neurology. R. 25. The ALJ discussed the neurological evaluations by Drs. Mahmoud and Jones in January and February 2017, a CT scan of her cervical spine, and two MRIs. In December 2017, Petrie was again seen for headaches by Physician's Assistant O'Brien. *Id*. Petrie reported that she had some relief from her symptoms for about four months with a blood patch, and O'Brien advised that she should return for additional blood patches. *Id*. This examination was followed by additional visits with Dr. Bettag, additional neurological evaluations, a neuropsychological evaluation, psychotherapy, and more MRIs. The ALJ noted

> There are . . . varying opinions regarding the claimant's vertigo symptoms, but the longitudinal record reflects that they are episodic and seasonal (see Exhibit 5F, p.

15

34; Exhibit 19F, p. 1). The record reflects that her symptoms are improved with use of medications such as meclizine, Zofran (ondansetron) and Valium (see Exhibit 1F, p. 12; Exhibits 5F, 7F, 25F). In regard to her headaches, the records show conservative treatments and that her symptoms have been improved with medications and a blood patch (Exhibits 23F, 24F, 28F).

R. 34.

Petrie asserts that the ALJ's discussion of her headaches and vertigo in her summary of the evidence supporting the RFC was cursory. In particular, Petrie argues that the treatment record for her headaches belies the ALJ's description of them as conservative and that the ALJ did not indicate what other treatment would have been appropriate. Whether Petrie's treatment for her vertigo and headaches was conservative or not is a question of opinion about which reasonable people might disagree. Petrie emphasizes the various efforts that were undertaken to determine the underlying cause of the symptoms Petrie alleged, including cisternography, which involves a lumbar puncture. Diagnostic measures are different than treatment, however, and the ALJ was referring to treatment.

The record reflects a range of treatments for Ménière's disease, ranging from conservative treatment with medications to more aggressive surgery. R. 1415. The ALJ noted that Petrie's doctors prescribed various medications for her headaches and vertigo, including Imitrex, Meclizine, and Zofran. She received a blood patch to help with headaches potentially caused by a cerebrospinal fluid leak, and she reported to a physician's assistant that she had some relief of her symptoms for about four months with the patch. R. 28. It was not improper for the ALJ to observe that Petrie's symptoms improved with certain medications and application of a blood patch. *See, e.g.*, R. 596 ("With regard to the dizziness, she states that while doing Prednisone and the Dyazide she states that she is actually doing much better with that and at this point as she is doing better will just recommend continued use of the Dyazide and follow up with us in 6

16

months."); R. 1193 ("She has had a blood patch done which gave her 85% relief for about four months."). Although Petrie was advised to return for additional testing, R. 28, there is no indication that she followed the recommendation. Petrie has not presented any reason why she did not or could not follow through with the treatment recommendations. The ALJ also accurately noted, based on the longitudinal record, that Petrie's vertigo appeared to be seasonal and related to her seasonal allergies. R. 34; *see, e.g.*, R. 508 ("Episodes seem to happen in the fall . . . ."); R. 599 (". . . she notes that it seems to happen more frequently in the fall, seems to notice it happening more when her allergies flare"); R. 615 ("She correlates her symptoms with fall allergy symptoms."). The fact that Petrie's improvement with treatment was temporary or that the treatment did not provide full relief does not contradict the ALJ's conclusions.

Although the ALJ may not have characterized, or drawn the same conclusions from, some of the evidence in the way that Petrie would have liked, Petrie has not shown that the ALJ ignored any material evidence that would have compelled a different finding. The ALJ provided a logical bridge between the severity of Petrie's headaches and vertigo and her conclusion that they were not as limiting as alleged. R. 34–35. That is all that is required. *See Clifford*, 227 F.3d at 872.

### C. Limitations in concentration, persistence, or pace

Petrie next argues that the ALJ's hypothetical question did not "properly inform the vocational witness of the limitations in concentration, persistence, or pace." Pl.'s Br. at 20. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). "This includes any deficiencies the claimant may have in concentration, persistence, or pace." *Id.* (citing *O'Connor-Spinner*, 627 F.3d 614, 619 (7th Cir. 2010)). If the VE has not reviewed the claimant's medical record or heard testimony about the

claimant's medical limitations, the hypotheticals must include all of the supported medical limitations. *Id.* at 857–58.

State agency psychologist Larry Kravitz, Psy.D, completed a Mental Residual Functional Capacity Assessment (MRFCA) on July 19, 2017. Dr. Kravitz noted that, with respect to understanding and memory limitations, Petrie was moderately limited in her ability to understand and remember detailed instructions. He explained in the narrative portion of the assessment that Petrie "reports difficulties with recent memory." R. 119. As to sustained concentration and persistence limitations, Dr. Kravitz noted that Petrie was moderately limited in her ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. R. 119–20. Dr. Kravitz explained that Petrie "may have difficulty recalling and carrying out detailed instructions" and "was noted to have difficulty recalling novel information on the MSE." R. 120. With respect to Petrie's adaption limitations, Dr. Kravitz found that Petrie was moderately limited in her ability to respond appropriately to changes in the work setting. *Id.* He observed in the narrative portion that Petrie's symptoms "may cause her difficulty in dealing with more than routine work stresses." *Id.* Dr. Kravitz provided the following narrative description of Petrie's MRFC: Petrie "retains the mental capacity to understand and remember 1-3 step tasks and mildly complex tasks. [Petrie] retains the mental capacity to sustain the performance of 1-3 step tasks through a normal workday or workweek with routine breaks and lunch. [Petrie] retains the capacity to deal adequately with co-workers and supervisors within the context of unskilled work. [Petrie] can adapt to changes/stressors associated with simple routine competitive work activities." *Id.*

The ALJ gave significant weight to Dr. Kravitz' opinion that Petrie "retained the ability to understand, remember and perform one to three step instructions and adapt to changes within a simple, routine work environment." R. 31. The ALJ ultimately found that Petrie had the following limitations: "the claimant (1) can understand, remember and carry out simple instructions; (2) can only make simple, work-related decisions; (3) can only tolerate occasional change in work location; and (4) cannot work at a strict production rate such as that required to work on an assembly line." R. 21.

As an initial matter, Petrie argues that the MRFC summary contained in Dr. Kravitz' report conflicts with the checked boxes in the MRFCA form and that the ALJ failed to address that discrepancy. Dr. Kravitz adequately translated his worksheet observations into his MRFC summary. The ALJ did not err in failing to address a discrepancy that did not exist.

Petrie also asserts that the limitations contained in her RFC do not account for or correspond to deficits in concentration, persistence, or pace. The Seventh Circuit recently reiterated in *Martin v. Saul* that "the law does not require ALJs to use certain words, or refrain from using others, to describe the pace at which a claimant is able to work." 950 F.3d 369, 374 (7th Cir. 2020). The same is true of the other functional areas. As the court explained in *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019), "[a]s a matter of form, the ALJ need not put the questions to the VE in specific terms—there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Id.* at 570 (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019)). Indeed, "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and

19

pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)).

In *Martin*, the ALJ found that the claimant could "work in a job involving only simple tasks with low stress, occasional changes, a flexible pace, and superficial interactions with others." 950 F.3d at 372. The court explained how the RFC assessed by the ALJ adequately accounted for the claimant's functional limitations in CPP:

> Start with concentration. The second ALJ found that "[Martin] could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." Moving to persistence, the ALJ, in defining and tailoring the RFC, further determined that Martin could stay on-task and thereby "meet production requirements." Of course, even if someone is on-task, it is still possible she may operate at such a slow pace that an employer would not find her work satisfactory. Hence, the second "P"—pace—must enter the equation. The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented. Ideally, the ALJ would have brought to the surface what is surely implicit in the determination—that any pace-based goals must be reasonable as a way of signaling that the employer could not set the bar beyond the person's functional reach. We take comfort here from the fact that the jobs the vocational expert suggested inherently reflected such a reasonableness limitation. Although Martin complains that the pace requirements are too vague, there is only so much specificity possible in crafting an RFC. The law required no more.

*Id.* at 374.

The same analysis applies here. Beginning with concentration, the ALJ found that Petrie can understand, remember, and carry out simple instructions and can only make simple, work-related decisions. R. 21. Petrie asserts that the ALJ erred by omitting any restriction to one- to three-step tasks from the RFC. But the ALJ's conclusion is consistent with Dr. Kravitz' finding that Petrie's "ability to understand and remember very short and simple instructions" was "not significantly limited," R. 119, meaning "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity." *See* POMS DI 24510.063. Dr.

Kravitz also concluded that Petrie's "ability to carry out very short and simple instructions" was "not significantly limited," as was her ability to "carry out detailed instructions" and to "make simple work-related decisions." R. 119. Next, the ALJ found that Petrie can only tolerate occasional change in work location, R. 21, which is consistent with Dr. Kravitz' finding that Petrie is "moderately limited" in her ability to "respond appropriately to changes in the work setting." R. 120. Dr. Kravitz concluded that Petrie "retained the mental capacity to sustain the performance of 1-3 step tasks through a normal workday or workweek with routine breaks and lunch." R. 120. To these limitations, the ALJ added that Petrie cannot work at a strict production rate such as that required to work on an assembly line. R. 21. In sum, the ALJ reasonably accounted for Petrie's CPP limitations in the RFC and hypothetical question. Substantial evidence supports her assessment.

## CONCLUSION

For the aforementioned reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
